RIVFS, J.
The verdict of the jury in this case is founded on the theory that the ap-pellee’s bond was a Confederate contract, payable in Confederate money, and to be scaled as of its date, 29th January, 1863, when such money bore to specie the relation of three to one. This led to the finding of $1,666.66, with interest from the said date. A new trial was asked for, on the ground that this verdict was contrary to law and the evidence. It was refused, and a bill of exception taken, setting forth a very meagre state of facts proven on the trial. These facts consisted of the production of the bond ; a demand of payment, acknowledged on the 25th June, 1865; the loan of $5,000 in Confederate treasury notes, as the consideration of this bond; and the value of such notes at the time of the loan, ascertained to be' the said sum of $1,666.66 in gold. The legal construction, therefore, which we are now required to put upon this instrument, receives no aid from extrinsic evidence, and depends wholly upon its terms, with such lights as we may derive from the situation of the parties, the subject-matter of the contract, and contemporaneous events in the history of the times.
Remarkable as his contract is, in its most distinctive feature, it is admitted on both sides, that the parties contracted on equal terms, and were men of uncommon intelligence and business capacity; so that no inequality whatsoever *in their relative situations has been insisted on or pretended as a ground to impeach the contract, or ask relief from its literal enforcement. They 'were both citizens of Virginia, and possessing equal means of information as to the past and present future of events bearing upon their contract, and likely, according to their respective beliefs and speculations, to influence, in the same or different ways, this agreement.
Contracts are usually referable, for their construction, to the laws of the country where made. Parties must be taken to contract in reference to them; and hence, the lex loci contractus is a prevailing canon of interpretation. In order, however, to test the applicability of this doctrine to our present enquiry, we must look to the situation of the parties, as affected by the remarkable political events that were then transpiring, and which might be naturally expected to enter into their consideration, and influence in some degree their agreement.
To this end, it is not necessary to enter at all into the vexed theories and controversies which engendered and attended the late war; we have only to seek for the facts of history, about which there is and can be no dispute. A contrariety of opinion exists as to the nature, the incidents and consequences of this struggle; but however differently viewed, it may be practically characterized, without offence to any of the opposing theories, as a revolution attempted, whether rightfully or wrongfully,
*763 by the seceding States. It was so organized by these communities, and endued with the attributes and prerogatives of a separate government, as to extort for the Confederacy, from foreign nations and the United States, the recognition of belligerent rights as belonging to it; and from the Federal judiciary, its acknowledgment as a de facto government. But still, during the pendency of the war, and while its result was confessedly uncertain, it seems to me ^scarcely correct to say that the citizens of the Confederate States had so completely thrown off the old, and established the new government, as to refer all their contracts to interpretation by the laws of the latter, as if its existence was undisputed. I can well understand how, in a long-established government, contracting parties, in the absence of any stipulation to the contrary, are ordinarily to be considered as contracting with reference to the laws of that government, and submitting their contracts to be interpreted by such laws. But what is there in this rule to confine the parties here, involved as citizens in a doubtful war, to an interpretation of their language by the laws of their existing government, and actually to inhibit them from contracting in respect to a new order of things? It was impossible not to foresee the probability of change in the currency; whether it should be by the substitution of another by the Confederate government when established, or by the return of Federal money through the restoration of Federal authority, was a consideration that might have fairly entered into the transactions of men. It would certainly curtail the freedom of such transactions to lay down the inflexible rule that parties in such a state of society cannot, on grounds of policy, be allowed to contract for payment in anything but their existing currency, and that nothing but a clear stipulation to the contrary can take their contract without this rule.
I do not at all dispute the authority of the English cases cited by the appellee’s counsel. On the contrary, I think them founded on strong reasons, and proceeding from the laudable determination of the courts of that country to construe contracts so as to effectuate the intentions of the parties. But I confidently submit, the case is a very different one here. I shall follow the principle of these adjudications in seeking fori the intentions of the parties to this bond when they used the terms “current "*funds, ’ ’ and to that end can not overlook the fact that they were treating “flagrante bello. ” I cannot be stopped on the threshold of this enquiry by the inexorable rule, contended for by the appel-lee’s counsel, that thesb words must be taken, by necessary implication of law, as importing Confederate currency alone. This would be, in my opinion, to disregard the true reason of these authorities, and to deny to our citizens at that time, under all the contingencies and uncertainties of their condition, that absolute freedom of contracting in view of all possible eventualities, which the principles of our common law secure to all, in spite of the changes ox government. Political changes and the conflict of arms do not affect nor abrogate private contracts where they do not contravene public policy nor positive enactments. The business of life must go on ; and unless the law upheld the contracts of men under such circumstances, not only at the time, but after the restoration of peace and a new order of civil polity, society would be disordered, and courts superseded in their most important functions. I cannot, therefore, agree with the able counsel for the appellees, that the parties here are precluded, by the reason, policy and intendment of the law, from affixing to the words “current funds” any other meaning than that of funds current at the date of the contract, and, consequently, “Confederate currency. ’ ’ On the contrary, I do not think these words, in the connection in which they are used, will bear this interpretation. I have two reasons for this opinion. The first proceeds from the well known condition of the currency at the time. It was greatly depreciated; and its depreciation was progressive, though with occasional and immaterial fluctuations. The question of the currency was most generally viewed apart from the fortunes of the Confederacy; and the success of the latter was by no means assumed as guaranteeing the former. The assertion of *'the appel-lee’s counsel, namely, that while entertaining absolute faith in the triumph of the' Confederacy, he was doubtful of the ultimate redemption at par of the Confederate treasury notes, describes truly the prevalent opinion in this State. In view of the practices of the Confederate Congress and the fate of other revolutionary paper issues, such as our Continental money, French assignats, &c., it would have been strange if there had not been a very general mistrust of the Confederate notes, in quarters even where no doubt ever intruded of the final establishment of the government that emitted them. The fact of such mistrust is conclusively proven by the depreciation of these notes after the brilliant successes of the Confederate arms in the fall campaign of 1862, just preceding this contract. I, therefore, deem this state of the currency, and of public opinion respecting it, as a material fact influencing the parties to this contract in designating “current funds” as the medium of payment, and declining to leave that important stipulation to reference or construction through their silence. My second reason for objecting to this interpretation of these words, arises out of the context. It is a promise “to pay, on demand, three months after notice to pay, the sum of five thousand dollars, without interest, in current funds.” This obviously imports that the funds were to be current at the time of payment. We cannot suppose that the time of payment should be made to abide exclusively the pleasure of the obligee, if it were not for *764 the privilege thereby secured to him of awaiting and selecting a currency he might prefer to the existing currency. Whether that should be the currency of the Confederacy during the war, or after its cessation, or the currency of the United States upon the restoration of its authority over this State and its citizens, depended on contingencies, if not in the actual contemplation of the parties, at least in the scope of their contract. We cannot suppose that ^either the one or other of these parties, or, indeed, both, failed to consider the chances of the obligee being compelled to recall this loan, though at a sacrifice, before the termination of hostilities, or of his being enabled to await the advent of a sounder currency, in the event either of the establishment of the Confederacy, or its overthrow by the Federal arms. It will not do to sajT that such contingencies never entered into the calculations, or influenced the agreement of the parties; it is enough to know that the terms of the contract, whether so designed or not, are broad enough to cover them. The stipulation is express, that the obligee “shall not be required to receive the money, except at his pleasure.” Why this remarkable provision? What purpose was it intended to subserve? I can conceive of no motive or speculation that led to it but this, namely, that inasmuch as the currency was then depreciated, and likely to undergo a further depreciation, the obligee might be thereby protected from the tender of a more worthless currency, and should have the option, without limitation as to time, to call for his money in a currency that might better suit him. The compensation for this privilege, on the obligor’s behalf, was an exemption from interest till after the demand of payment. The treaty of the parties may be explained in this wise: Mr. Newton wants the use of these Confederate notes for some purpose or other not stated in this record ; and in proposing to take them of Mr. Boulware, agrees, in view of their progressive depreciation, to protect him against loss from that source, and give him the benefit of any future improvement of the currency,' by a stipulation that this money should be upon call for an indefinite period, to be fixed at the sole pleasure and will of Mr. Boulware. At the same time, and as a return for this large concession, he requires of Mr. Boul-ware that the obligor should not account for interest until after formal demand, nor be *bound to pay until after three months’ notice of,such demand. This seems to me to portray accurately the character of the negotiation that led to this bargain; and serves to elucidate the contract in which it resulted. Hence, the agreement of Mr. Newton is to pay the $5,000 without interest, at the call of Mr. Boulware, in such funds as might be current at the time of payment. In the event that has happened, this seems to be improvident; but in another event, this might not have been so. If from the ravages of war his creditor had been so reduced, or from other causes so inclined, as to call for payment in the fall of 1864, then Mr. Newton would have realized a profit upon the adventure, proportioned to the sacrifice of the principal occasioned by the actual and lamentable depreciation of the currency at that time. The imputed hardship of the bargain in this respect, might, for aught we know, have been obviated by the use to which Mr. Newton applied this money. If he discharged therewith a specie debt, as was sometimes, though rarely done at that date, or purchased property at the same standard, he could in no event be injured. But whether this was done or not is matter of conjecture, merely employed by way of illustration. Let the bargain, however, be as imprudent and hard as it may be, if it is thus clearly written, and properly construed, there can be no relief against it in this form of action, and under these pleadings. If assailed as an unconscionable bargain, it must be in another forum.
An action of covenant has been brought on this agreement, and a question arises, What shall be the measure of damages? The statement in the bill of exceptions shows, that the consideration of this undertaking consisted in Confederate treasury notes of the nominal amount of $5,000. These notes, from their depreciation, did not fulfill the proposed function of a representative of money; hence the Legislature, in order to prevent hardships and ^effectuate justice in private dealings in this fluctuating currency, resorted to scaling; and this court, as in case of depreciated bank notes, has treated these notes as a commodity in trade. While the common understanding and the literal form of the transaction justified the court below in describing it as a loan in Confederate treasury notes of $5,000, we must look beyond the mode of expression into the actual substance of the contract. Had the contract contemplated the re-payment of that sum in the same currency in which it was received, then it would indeed have been substantially a loan; but I have endeavored to show that such was not the understanding of the parties, and that for the use of these notes the covenantor bound himself to pay the stipulated sum at a future and undefined time, in a currency that might be either better or worse, at the election of the covenantee. Hence, I take it that the price of this commodity was agreed, and that the only measure of damages for nonperformance is that agreed price, namely, $5,000 in “funds current” at the time of payment.
From the view I have thus taken, I conclude that this is a contract of hazard. In the contingency of a-demand of payment by the obligee when “current funds” were more worthless than at the date of the contract, much of the principal would have been lost. Of course it is not to be supposed that the creditor would make the demand and give his notice at such a time, unless driven to it by inexorable want. But who can undertake to say, in view of *765 the disasters that wrecked property and wealth to such an amazing- extent, that this payment, however reduced by the state of the currency, might not have been necessary to the appellant before that currency totally expired by the overthrow of the Confederacy? Besides, the debtor had on his side the weight of all those considerations which might have impelled to a call for this money, as a prudential *step to escape the greater loss and the vexatious delay likely to attend the precarious credit, the deranged finances and the inflated currencies of the hostile governments.
I am sustained in these views by the case of Brachan v. Griffin, 3 Call 375. In that case Griffin agreed, in consideration of ¿£25,000 paper money, to be paid him by Willis in the years 1780 and 1781, to pay the latter ¿£2,500 in specie in 1790. Griffin brought his bill in chancery for relief against Brachan the assignee, upon special circumstances that need not be here stated. He failed, and the contract was held obligatory. Judge Fleming said, that “the contract in this case was founded upon speculation on both sides. Griffin thought the present use of the money would be advantageous to him; and Willis, that it would be more beneficial to receive the specie at a •distant day. The contract seems to have been fully understood by the parties, and to have been fairly entered into upon both sides. ’ ’ Judge Carrington adopted the same view, and said: “This was a mere speculation upon the paper currency of the country. Griffin attached a value to the present use of a considerable sum of it; Willis calculated that it would be better to part with it and receive specie for it at a more distant period. Both of them acted fairly in making the contract, and there is nothing to taint or impeach it, if it has been complied with by Willis. ’ ’ The language thus quoted from these judges in their decision of that case is strictly applicable to this. The engagement of Newton to pay in “current funds” instead of specie does not make a difference between the cases so far as the principle of the adjudication is concerned, because of the maxim, that 1 ‘that is certain which may be made so. ’ ’ Both of these contracts, therefore, may be properly termed “speculations upon the paper currency of .the countrju ”
The only remaining question in this case, that of usury, *'is virtually disposed of by the interpretation already placed upon this contract. It has not been deemed a loan in the strict sense of that word ; and the contingency has been pointed out that piit in risk the principal itself. Interest is expressly forborne; but that would not suffice, if, as a shift to avoid the terms of the statute, there was an agreement to pay at a future period for a present loan an aggregate sum exceeding the principal and interest of the sum borrowed. But wherever the re-payment of the principal as well as the interest is made to depend upon the happening of contingent events, and may thus be jeopardized, a reservation of a larger sum than the interest, is accounted a compensation for the risk thus incurred and is not deemed usury. This principle is as old as the case of Roberts v. Tremayne, Cro. Jac. 507, where it was laid down: “If I lend ¿£100 to have ¿£120 at the year’s end, upon a casualty, if the casualty goes to the interest only, and not to the principal, it is usury, for he is sure to have his principal again, come what will come; but if the interest and principal were both in hazard, it is not then usury.” This ancient authority was impugned bj counsel in the case of Smith v. Nicholas, &c., 8 Leigh 330, but was amply vindicated upon authority and reason by Judge Tucker, who delivered the opinion of the court in that case, which vacated as usurious a contract whereby the lender, besides his principal, contracts to receive, in lieu of interest, something which may be worth more than six per cent, per annum, though it may perhaps be worthless, as the dividends on bank stock. He quotes with approbation the remark of Judge Pendleton in Gibson v. Fristoe, &c., 1 Call 54, — “but if the principal, or any considerable part, be put in risque, it is not usury because the excess in the premium is a consideration for that risque;” and distinctly puts his decision on the ground “that where the interest only is, at hazard, the statute is infringed by a *contract for more than legal interest. ’ ’ Upon this same foundation rests the doctrine of maritime losses upon bottomry and respondentia, of such universal use and importance in commerce. Here no interest accrues till after demand, and it is only in case the demand be not complied with that any can be due. The contingency or casualty in this case, therefore, affects only the principal; and because that may be worth more or less when called for in “current funds” than the aggregate sum of principal and interest on the original sum advanced is the cause which attests the risk of this trade, and frees it from the charge of usury. The finding of the jury, therefore, against this plea is justified by two reasons: first, because the transaction is ' not to be treated as a loan, but as an agreement to pay for a commodity; and secondly, because, in the language of Justice Bridgman, in Soome v. Gleen, Sid. R. 27, it was “a plain and square bargain, by which the principal was hazarded.” Though it may be infer-rible that the appellee might have acquiesced in the finding of the jury against him on this plea of usury, he is clearly entitled to avail of the appeal of his adversary to correct any error therein to his prejudice. The whole record is before us, and if it discloses an error that should enure to the advantage of the appellee, we are bound, I presume, to correct it. I have, therefore, examined the question arising under this plea with the same care I should have done if it had been made the subject of appeal by Mr. Newton.
I have thus endeavored to state plainly and succinctly my views of this contract, *766 and the questions raised upon it. I am sensible of the importance of avoiding- an}' grounds of misapprehension and mistake. It would be scarcely proper at this time to anticipate and prejudge a question that may hereafter arise out of the obligation to pay in “current funds” — -the synonym at this time of *“ legal tenders” or national bank notes, which are now quotable at a common rate of depreciation —and out of the inability of the court to render any other judgment but one sounding in dollars and cents, and of course entitling the party to lawful money. This is a grave question, which may not arise, and should not be decided except in a proper case and upon the fullest consideration.
My investigation of this case has not been unattended by doubts and difficulties; but they have given way upon the anxious and careful deliberation I have given to this important inquiry. I have not felt the necessity of calling to my aid the rule that requires that all instruments should be construed “contra proferentem.” Though the value of this rule has been decried, it seems to me to rest on sound reason; for it is to be presumed “that men will take care of themselves, and consequently that he who gives, and chooses the words by which he gives, ought to be held to a strict interpretation of them rather than he who only accepts. ’ ’ 2 Parsons on Contracts 507; Meyer v. Isaac, 6 Mees. & Welsb. R. 605. Had my hesitation been greater, and my doubts more serious, the .balance might have been turned by this rule against the sole con-venantor; but my mind was impelled in that direction by other principles of interpretation that I have already sufficiently indicated. The construction which I have thus reached obliges me to conclude that the judgment below should be reversed, and a new trial had in conformity with the principles herein declared.
The other judges concurred in the opinion of Rives, J.
Judgment reversed.